**REDACTED**

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
10/12/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
10/12/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: M.M. DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>Jorge Armando Contreras,<br><br>Defendant(s) | Case No. 8:23-mj-00513-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of August 24, 2022 to July 26, 2023 in the county of Orange in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 666(a)(1)(A) | Embezzlement concerning programs receiving federal funds |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
*Complainant's signature*

Timothy W. Bamford, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    October 12, 2023

_____
*Judge's signature*

City and state:   Santa Ana, CA

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA: Billy Joe McLain, 213-894-6702

**ATTACHMENT A-1**



**ATTACHMENT A-2**



ATTACHMENT A-3



**ATTACHMENT A-4**



**ATTACHMENT B**























**AFFIDAVIT**

I, Timothy Warren Bamford, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.    I am a Special Agent ("SA") for the Federal Bureau of Investigation ("FBI") and have been so employed since June 2022. I am currently assigned to the Los Angeles Field Office's Orange County Resident Agency.  My duties include, investigating federal fraud crimes, such as wire fraud, mail fraud, honest services fraud, money laundering, and embezzlement, among other federal criminal violations.  I received about 18 weeks of formal training in investigative techniques and financial crimes at the FBI Academy in Quantico, Virginia.  Additionally, since October of 2022, I have worked on a public corruption and health care fraud squad at the FBI, where I have been working with other experienced FBI agents and analysts, as well as other law enforcement agents, while investigating federal fraud and public corruption offenses.  During this time, I've received on-the-job training while working with these agents and analysts.  Prior to my service with the FBI, I was a police officer for the Federal Reserve Bank of Boston, Massachusetts for six years.  In 2021, I graduated from New England Law, Boston and passed the Massachusetts bar exam.  I have previously assisted in the execution of numerous federal search and arrest warrants.

1

## II.  **PURPOSE OF THE AFFIDAVIT**

2.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, JORGE ARMANDO CONTRERAS ("CONTRERAS") for a violation of Title 18, United States Code, Section 666(a)(1)(A) (embezzlement concerning programs receiving federal funds).

3.    This affidavit is also made in support of search warrants for the below premises, vehicle, and persons, further described in Attachments A-1 to A-4, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 666(a)(1)(A) (embezzlement concerning programs receiving federal funds); Section 1956 (money laundering); Section 1957 (engaging in monetary transactions in property derived from specified unlawful activity); and Section 371 (conspiracy to commit the foregoing crimes)(the "Subject Offenses"):

a.    The residence located at ███████████████ ███████████████████ (the "SUBJECT PREMISES"), as more fully described in Attachment A-1;

b.    A 2021 BMW X5, ████████████████,████████ ████████████ ("SUBJECT VEHICLE"), as more fully described in Attachment A-2;

c.    The person of CONTRERAS, as more fully described in Attachment A-3, including any digital devices found on CONTRERAS's person or within his immediate reach;

d.    ████████████████████████████

████████  ████████████████████████████

████████████████████████████████████

████████████████

4.    The facts set forth in this affidavit are based upon my personal observations, including documents and data I have reviewed while investigating this case, my training and experience, and information obtained from various law enforcement personnel as well as witnesses who have been interviewed during the investigation of this case.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of, or investigation into, this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

5.    The Magnolia School District (the "School District") is a publicly funded organization that includes numerous schools in the cities of Anaheim and Stanton, California.  These schools educate children from preschool through the sixth grade – 81

percent of whom are classified as socio-economically disadvantaged.  Each year, since 2009, the School District has received millions of dollars in federal funds.

6.   Since 2013, CONTRERAS, the Director and then Senior Director, Fiscal Services, for the School District, managed its fiscal operations, and has embezzled over $14 million dollars from the School District by making unauthorized payments to himself from School District funds.  These payments came from over 250 checks from the School District that were deposited into CONTRERAS's personal bank account.

7.   Focusing just on the last year, between August 24, 2022 and July 31, 2023, CONTRERAS embezzled over $4.1 million dollars from the School District.  In fact, about 93 percent of all deposits in CONTRERAS's personal Wells Fargo bank account ending in 2435 ("CONTRERAS's Wells Fargo Account") during this time period were from embezzled funds from the School District. Additionally, during this time period, payments made from CONTRERAS's Wells Fargo Account included over $1.9 million dollars paid to American Express, $325,000 withdrawn from ATMs, and over $130,000 transferred to his partner, ██████ who CONTRERAS recently married in August 2023.

8.   In furtherance of this scheme, CONTRERAS used the SUBJECT VEHICLE, which he purchased with funds from CONTRERAS's Wells Fargo Account, to deposit embezzled funds from the School District — at Drive Thru ATMs — into CONTRERAS's Wells Fargo Account.

4

9.   In 2020, CONTRERAS purchased the SUBJECT PREMISES for about $1.5 million dollars, paid for over a million dollars of it via a wire transfer from CONTRERAS's Wells Fargo Account, and altered bank statements submitted as part of the loan application to hide funds embezzled from the School District.

### IV.   STATEMENT OF PROBABLE CAUSE

10.   Based on bank records, records and data from the School District, witness interviews, my training and experience, and information obtained from law enforcement agents and analysts investigating this case, I am aware of the following:

**A.   The School District and CONTRERAS's Management of the School District's Funds.**

11.   According to records provided by the School District, during fiscal years 2020-2021, 2021-2022, and 2022-2023, the School District received over $10 million dollars in federal funding for each year.  Additionally, the School District received over $2 million dollars in federal funding each fiscal year from fiscal year 2008-2009 through fiscal year 2019-2020.[1]

12.   CONTRERAS has worked within the School District since 2006.  He was placed on administrative leave without pay in August 2023.[2]  Between 2009 and 2022, CONTRERAS's annual salary

---

[1] Embezzlement concerning programs receiving federal funds, 18 U.S.C. § 666(a)(1)(A), requires, among other things, that "the organization, government, or agency [from which "property" is embezzled] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  Id. at § 666(b).

[2] On August 14, 2023, the School District filed a civil complaint against CONTRERAS for conversion and fraud, among other things. In September 2023, CONTRERAS's Wells Fargo Account was frozen
*(footnote cont'd on next page)*

increased incrementally from about $50,000 per year to about
$220,000 per year.

13.   Since about 2013, CONTRERAS has served as the
Director, Fiscal Services, for the School District.  In 2017,
his title was changed to Senior Director, Fiscal Services.  In
that position, CONTRERAS has managed School District funds and
has written checks from certain funds, including funds in
various School District bank accounts, such as the School
District's revolving cash funds account with Bank of the West
ending in 4043 (the "MSD Cash Funds Account") and the student
body account, also with Bank of the West, ending in 3714 ("MSD
Student Body Account").

14.   According to School District Chief Business Official
██████████████████████ ("CBO ██████"), checks were often
written from the MSD Cash Funds Account for small payments, such
as payroll mistakes, and the MSD Student Body Account was used
for fundraising.

**B.    CONTRERAS Embezzled Millions of Dollars from the
       School District.**

15.   According to Wells Fargo bank records, between August
29, 2016 and July 31, 2023, over $14 million dollars was
deposited into CONTRERAS's Wells Fargo Account from the MSD Cash
Funds Account and the MSD Student Body Account.  These $14

---

pursuant to a civil temporary restraining order.  On October 10,
2023, an attorney for the School District told FBI Special Agent
Ignacio Ramos that CONTRERAS is represented by Kim Schumann in
the School District's civil suit, and Mr. Schumann had informed
her that CONTRERAS is also being represented by a criminal
lawyer, whose name she does not know.  A Google search shows Mr.
Schumann is a partner at the law firm Schumann Arevalo LLP.

million dollars came from over 250 checks, all of which were made out to someone other than CONTRERAS. And the money from these transactions comprised more than 83 percent of all deposits into CONTRERAS's Wells Fargo Account between August 29, 2016 and July 31, 2023.

16. Focusing on the last year, Wells Fargo Bank records show that between August 24, 2022 and July 31, 2023, over $4.1 million dollars from the MSD Cash Funds Account was deposited into CONTRERAS's Wells Fargo Account. These checks ranged from about $11,000 to about $95,000. And all these checks listed the payee as "Maria Socorro Dominguez" or "Magnia Socorro Dominguez." According to CBO ████ and Superintendent ████ ████ ("Superintendent ████"), there is no record of a "Maria Socorro Dominguez" or "Magnia Socorro Dominguez" working at the School District.

17. According to Wells Fargo bank records and Bank of the West records, these checks were deposited via ATM into CONTRERAS's Wells Fargo Account. In fact, Wells Fargo bank photographs show an individual, who matches CONTRERAS's DMV picture, depositing some of these checks into CONTRERAS's Wells Fargo Account at ATMs. For example, the below photographs of CONTRERAS making ATM deposits into CONTRERAS's Wells Fargo Account temporally line up with the following checks from the School District written to payee "Maria Socorro Dominguez":

a.    On April 27, 2023, ATM Deposit at the Wells Fargo Branch located on 141 W. Bastanchury Road, Fullerton, CA for $73,500:



b.    On June 8, 2023, ATM Deposit at the Wells Fargo Branch located on 230 S. State College Blvd., Brea, CA for $85,350:



c.   On July 25, 2023, ATM Deposit at the Wells Fargo Branch located on 230 S. State College Blvd., Brea, CA for $89,150:[3]



18.   According to CBO ███████, while he and CONTRERAS were working together, CONTRERAS would ask for CBO ███████'s signature on checks from the MSD Cash Funds Account.   CBO ███████'s signature was required for checks written from the MSD Cash Funds Account.   But the amounts on those checks were typically smaller amounts (less than $2,000) consistent with checks from a petty-cash fund, not tens of thousands of dollars that are seen on the checks that were ultimately deposited into CONTRERAS's Wells Fargo Account.   Moreover, according to CBO ███████, the checks CONTRERAS presented him for signature often listed the payee as only "M    S    D" with the letters spaced apart.   Based on this information, it appears that CONTRERAS would, at least

---

[3] The photographs from June 8 and July 25, 2023 show CONTRERAS making ATM deposits in the SUBJECT VEHICLE.

on several occasions, alter/increase the amount of a check and modify the payee of a check (e.g., by filling in "M     S     D" with "Maria Socorro Dominquez" or a similar name) after obtaining CBO ████████'s signature.

### C. CONTRERAS Falsified Documents to Cover His Embezzlement from the School District.

19.  According to CBO ██████, CONTRERAS was responsible for conducting bank reconciliations of the MSD Cash Funds Account for the School District.  A bank reconciliation is a process by which the School District compares balances and transactions on their external bank statements with balances and transactions on the School District's internal ledgers.  As part of his duties for the School District, CONTRERAS submitted reconciliation packets to CBO ██████ for review every six months.  The bank reconciliation packet included a cover sheet, a bank statement from Bank of the West (which is the School District's bank), and documentation to justify checks written from the MSD Cash Funds Account.

20.  According to Superintendent ████████, after Wells Fargo notified the School District about potential fraud regarding the MSD Cash Funds Account in August 2023, he searched CONTRERAS's office and discovered altered MSD Cash Funds Account bank statements.  For example, a comparison of the MSD Cash Funds Account statement from June 2023 received from Bank of the West reflected an ending balance of over $1.2 million dollars, whereas the School District's internal bank statement from the same MSD Cash Funds Account from June 2023 reflected an ending

balance of about $50,000.  CONTRERAS signed the cover sheet
certifying the accuracy of the internal bank statements, which
were submitted as part of the reconciliation packet.

21.  What's more, agents investigating this case and I have
reviewed additional bank reconciliation documentation from the
School District between July 2022 and June 2023.  During this
time period, the School District's internal bank statements
regarding the Cash Funds Account were generally around $50,000,
while the Bank of the West statements for the Cash Funds Account
reflected a different ending balance, which were generally much
higher than $50,000, and ranged between about $62,000 and $1.2
million.[4]  Indeed, the average monthly ending balance of the Bank
of the West statements for the Cash Funds Account over that 11-
month time period was about $317,000.  Again, CONTRERAS signed
the cover sheet certifying the accuracy of these internal bank
statements, which were submitted as part of the reconciliation
packet.

22.  According to Superintendent ███████ and CBO ███████,
the balance for the MSD Cash Funds Account was not supposed to
exceed about $50,000 — consistent with the MSD Cash Funds
Account's limited purpose of serving as a petty-cash account.
Based on this information, and my training and experience as
well as the training and experience of other agents
investigating this case, it appears that CONTRERAS was
falsifying bank statements that were shown to other School

---

[4]  One statement from Bank of the West for the Cash Funds Account
–November 2022 – is an exception.  The statement ending balance
for that month was $34,833.82.

District officials during the reconciliation process to reflect a smaller balance in the MSD Cash Funds Account, which would help hide his embezzlement of money from the MSD Cash Funds Account.

> **D.    CONTRERAS Spends Funds from CONTRERAS's Wells Fargo Account on Cosmetic Treatment, the SUBJECT VEHICLE, the SUBJECT PREMISES, Designer Clothes, and Transfers Some of Those Funds to Another Account.[5]**

23.    According to Wells Fargo records, between August 24, 2022 and July 31, 2023, about $4.4 million dollars in total deposits (including deposits that were not checks from the MSD Cash Funds Account) were made to CONTRERAS's Wells Fargo Account.

24.    Of the $4.4 million dollars deposited in CONTRERAS's Wells Fargo Account, over $4.1 million dollars was deposited from checks written from the MSD Cash Funds Account to "Maria Socorro Dominguez" and "Magnia Socorro Dominguez."  In other words, about 93 percent of all deposits in CONTRERAS's Wells Fargo account between August 24, 2022 and July 31, 2023 were deposits from the MSD Cash Funds Account.

25.    During this same time period (August 24, 2022 to July 31, 2023), Wells Fargo records show the following transactions:

        a.    Over $25,000 paid to Louis Vuitton,[6] over $1.9

---

[5] Money laundering, under 18 U.S.C. § 1957(a), requires, among other things, that a person "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity."  Id.

[6] The beneficiary of the payments, according to bank records, is listed as "LOUIS VUITTON ESER" or "Louis Vuitton USA."

million dollars paid to American Express,[7] and over $325,000 withdrawn from ATMs.  Additionally, CONTRERAS made multiple wire transfers totaling over $190,000 to a medical doctor with the initials J.E.  The wire transfers ranged from about $8,000 to $90,000.  A Google search revealed that J.E. is a cosmetic dermatologist and surgeon in West Hollywood, California.  Based on this information, it appears that CONTRERAS spent this money on cosmetic treatment.  More still, Wells Fargo bank and JP Morgan Chase records show that on July 28, 2023, CONTRERAS wrote check #4829 from the Wells Fargo Account payable to himself for $150,000.  The memo section of the check states for "New Account."  This check was used to open two new bank accounts at JPMorgan Chase.

26.  In addition to the payments directly from CONTRERAS's Wells Fargo Account, during this same time period (August 24, 2022 to July 31, 2023), CONTRERAS's American Express account was charged over:

a.  $60,000 at Louis Vuitton stores, including the following transactions:

| Date | Amount | Merchant |
| --- | --- | --- |
| 11/18/2022 | $28,247.15 | LOUIS VUITTON #142 |
| 12/29/2022 | $28,497.22 | LOUIS VUITTON #142 |

---

[7] Multiple payments to American Express exceeded $10,000.

b.    $350,000 at Gianni Versace boutiques, including the following transactions:

| Date | Amount | Merchant |
|------|--------|----------|
| 8/26/2022 | $36,764.31 | GIANNI VERSACE BOUTIQUE - |
| 9/16/2022 | $29,194.87 | GIANNI VERSACE BOUTIQUE - |
| 9/30/2022 | $30,350.28 | GIANNI VERSACE BOUTIQUE - |
| 10/16/2022 | $26,230.78 | GIANNI VERSACE BOUTIQUE - |
| 11/13/2022 | $38,967.80 | GIANNI VERSACE BOUTIQUE - |
| 12/10/2022 | $49,713.17 | GIANNI VERSACE BOUTIQUE - |
| 2/26/2023 | $50,803.07 | GIANNI VERSACE BOUTIQUE - |
| 3/18/2023 | $15,503.41 | GIANNI VERSACE BOUTIQUE - |
| 4/1/2023 | $11,525.00 | GIANNI VERSACE BOUTIQUE - |
| 4/16/2023 | $18,694.64 | GIANNI VERSACE BOUTIQUE - |
| 4/29/2023 | $36,925.95 | GIANNI VERSACE BOUTIQUE - |
| 5/28/2023 | $15,462.14 | GIANNI VERSACE BOUTIQUE - |

c.    $180,000 at David Yurman jewelry store, including the following transactions:

| Date | Amount | Merchant |
|------|--------|----------|
| 6/3/2023 | $72,946.75 | DAVID YURMAN RETAIL |
| 6/17/2023 | $112,146.20 | DAVID YURMAN RETAIL |

**E.    CONTRERAS Used Funds from CONTRERAS's Wells Fargo Account to Purchase the SUBJECT VEHICLE.**

27.    According to Wells Fargo and BMW records, on February 11, 2021, CONTRERAS purchased the SUBJECT VEHICLE for about

14

$127,000.   CONTRERAS made an $80,000 downpayment from
CONTRERAS's Wells Fargo Account, which he also used to pay off
the remaining balance in July 2022.

### F.   CONTRERAS Used Funds from CONTRERAS's Wells Fargo Account to Purchase the SUBJECT PREMISES and Falsified Mortgage Loan Documents.

28.   According to Wells Fargo, mortgage records, and escrow
records, on July 27, 2020, CONTRERAS applied for a loan in the
amount of $350,000 to purchase the SUBJECT PREMISES.   The
SUBJECT PREMISES was purchased for about $1.5 million dollars.
On the loan application, CONTRERAS stated that his gross monthly
income was $16,507 (about $198,084 a year) as the Senior
Director of the Magnolia School District.   On July 24, 2020,
CONTRERAS wire transferred $1,146,500 from CONTRERAS's Wells
Fargo Account to Escrow Experts Inc. Trust account for the final
payment to close escrow and purchase the SUBJECT PREMISES.

29.   The loan application included a June 2020 bank
statement from CONTRERAS's Wells Fargo Account.   A comparison of
the June 2020 bank statement included in the loan application
and a June 2020 bank statement that agents investigating this
case received from Wells Fargo, shows a discrepancy between the
two bank statements.

30.   More specifically, the June 2020 bank statement
submitted as part of the loan application shows, among other
things, an ATM deposit on June 22, 2020 for $8,660.99 and a
total deposit amount for that statement period of $18,911.95.
By contrast, the same June 2020 bank statement received from
Wells Fargo shows an ATM deposit on June 22, 2020 of $98,660.99

and a total deposit amount for that statement period of $108,911.95.   A further review of the source of the June 22, 2020 deposit that was altered in the submission for the loan application shows that it was three checks from the School District (check #10125 for $60,802.57, check #10126 for $25,806.85, and check #10127 for $12,051.57), all of which were made payable to "Maria S. Dominguez."   From my training and experience, and the experience of other agents investigating this case, it appears that CONTRERAS altered the bank statement he submitted as part of the loan application to purchase the SUBJECT PREMISES.   This would help avoid any questions from the bank about a $98,660.99 ATM deposit, made payable to someone other than CONTRERAS, which may have uncovered CONTRERAS's embezzlement scheme.

G.    **CONTRERAS Transferred Funds to Mexico.**

31.   Between November 2018 and May 2023, CONTRERAS wired over $150,000 to multiple banks in Mexico from CONTRERAS's Wells Fargo Account.   Wells Fargo wires include a detail section to allow the sender to enter a note for each wire.   Many of the notes on CONTRERAS's wires were related to construction projects, payments for services, and purchases.   For example, a wire transferred in November 2018 in the amount of $3,133.38, included the memo "building home;" a wire transferred in March 2020 in the amount of $5,000, included the memo "Construction doors stairs and window;" and a wire transferred in November 2022 in the amount of $5,000, included the memo "luxury jackets."

**H.    JC Productions.**

32.   According to CBO ████████, JC Productions is CONTRERAS's musical production company.[8]  On September 29, 2023, the Instagram page for "Jorge Armando Contreras @JCproductions1" ("CONTRERAS's Instagram Account") had about 2.7 million Instagram followers and stated, next to a photograph of CONTRERAS, "JCProductions, the best musical productions and live events."[9]  The Instagram page showed numerous posts of musical events along with photographs of CONTRERAS, in designer clothes, such as that pictured below:



---

[8] According to Orange County Clerk Recorder website, on October 5, 2018, CONTRERAS filed a fictitious business name with the Orange County clerk recorder for JC Productions.

[9] This is an English translation.  The original version states, "JCProductions, las mejores producciones musicales y eventos en vivo."

33. According to CBO ██████, CONTRERAS appeared to live a lifestyle beyond the means of someone in his position at the School District. CBO ██████ assumed CONTRERAS's source of additional income was from JC Productions. For example, CBO ██████ explained there had been a billboard of JC Productions promoting an artist, with the initials W.G., that was within the School District's territory. CBO ██████ also explained that one year, during the December holidays, CONTRERAS gave school district employees $25 Starbucks gift cards with writing on the back of those cards stating they were from JC Productions.

34. Although Wells Fargo records show deposits into CONTRERAS's Wells Fargo Account that appear to be related to, or that reference, JC Productions,[10] over 83 percent of deposits into CONTRERAS's Wells Fargo Account from August 29, 2016 to July 31, 2023 (over $14 million dollars) were checks from the MSD Cash Funds Account and MSD Student Body Account.[11] Based on the above facts, as well as my training and experience and that

---

[10] For example, agents investigating this case and I have reviewed Wells Fargo bank records from August 29, 2016 to July 31, 2023, and we have identified transfers from PayPal, Ticketon Entertainment, M3 Live, and El Crillon LLC, among others, some of which reference JC Productions and some of which do not. Additionally, I have identified in SchoolsFirst Federal Credit Union records, September 2018 transfers from M3 Live to a SchoolsFirst account that belongs to CONTRERAS. These types of transfers that agents and I have identified at this point in Wells Fargo and SchoolsFirst records total about $509,000.

[11] Other deposits during that timeframe include about $763,378 in direct deposits (salary) from the School District, about $613,511 from an escrow deposit, and about $500,000 from CONTRERAS's Wells Fargo savings account ending in 3046, see infra.

of other agents investigating this case, it appears that JC Productions served, at least in part, as a "front" company to help explain CONTRERAS's apparent wealth and further conceal CONTRERAS's embezzlement scheme.

**I.   CONTRERAS Transferred Funds Between His Accounts and Attempted to Transfer Funds into Another Person's Bank Account.**

35.   Between August 1, 2016 and July 31, 2023, over $1.6 million dollars in checks (that came from the MSD Cash Funds Account and the MSD Student Body Account) were deposited into a Wells Fargo savings account ending in 3046, which CONTRERAS had opened in March 1991 ("CONTRERAS's Wells Fargo Savings Account").  Wells Fargo Bank records show that during this time period (August 1, 2016 to July 31, 2023),[12] CONTRERAS had transferred hundreds of thousands of dollars between different Wells Fargo bank accounts belonging to or otherwise associated with CONTRERAS, including transfers to and from CONTRERAS's Wells Fargo Account and CONTRERAS's Wells Fargo Savings Account.

36.   For example, in October 2018, CONTRERAS opened a Wells Fargo Advisors brokerage account ending in 9533 ("CONTRERAS's Wells Fargo Brokerage Account") with $500,000 of funds, which were transferred from CONTRERAS's Wells Fargo Savings Account.

37.   What's more, on August 4, 2023, Wells Fargo Clearing Services LLC issued check# 19978649 to CONTRERAS for $519,082.11 from CONTRERAS's Wells Fargo Brokerage Account.  According to information provided by Bank of America, on September 14, 2023,

---

[12] Deposits from other sources were also made into CONTRERAS's Wells Fargo Savings Account.

there was an attempt to deposit check# 19978649 into ▮▮▮▮
▮▮▮▮▮▮▮▮ Bank of America account ending in 0508.  The back of
check# 19978649 was signed by CONTRERAS and endorsed to ▮▮▮▮
▮▮▮▮▮▮.  The check was also signed by ▮▮▮▮▮▮▮▮▮  But
Bank of America denied the deposit due to CONTRERAS not being a
signor on ▮▮▮▮▮▮▮▮ account ending in 0508.

    38.  According to information provided by Bank of America,
on September 26, 2023, CONTRERAS and ▮▮▮▮▮▮▮ opened a
joint account at Bank of America and deposited check# 19978649
into the newly opened joint account ending in 8232.  As of
October 2, 2023, the funds from check# 19978649 were in a
deposit status only and had not been made available.

    **J.   Additional Information Regarding CONTRERAS, ▮▮ the
    SUBJECT PREMISES, the SUBJECT VEHICLE, and Digital Devices.**

    39.  According to Superintendent ▮▮▮▮▮ and ▮▮ ▮▮▮▮,
CONTRERAS recently married his partner,▮▮▮▮  According to
CONTRERAS's Facebook Account, which shows photos of a wedding
with individuals I recognize as CONTRERAS and ▮▮▮ from their
DMV photographs, CONTRERAS married ▮▮▮ on August 26, 2023.

    40.  Wells Fargo bank records show that between September
2022 to July 2023, CONTRERAS deposited over $130,000 via
multiple peer-to-peer transfers and two wires from CONTRERAS's
Wells Fargo Account to a Wells Fargo account ending in 7733,
which Wells Fargo records show belong to CONTRERAS's partner,
▮▮▮▮  One of the wires to ▮▮▮ was on or about July 5, 2023,
for $13,850, and the other wire to ▮▮▮ was on or about July 26,
2023, for $47,500.

41.   As for the SUBJECT PREMISES, bank records from JP Morgan Chase, Wells Fargo, and Barclays Bank, show that CONTRERAS listed the SUBJECT PREMISES as his home address. Additionally, CONTRERAS's DMV records list the SUBJECT PREMISES as his home address.  On September 9, 2023, ███████ Instagram account ████████████████ which includes multiple photographs that I recognize as ██████ from his DMV photo, posted a video showing CONTRERAS standing outside of the SUBJECT PREMISES.  And on September 14, 2023, FBI Special Agents Tim Bamford and Ignacio Ramos observed, through recorded video surveillance, CONTRERAS opening the door to the SUBJECT PREMISES to greet a visitor.

42.   Regarding the SUBJECT VEHICLE, on September 28, 2023, FBI surveillance observed CONTRERAS and ██████ traveling in the SUBJECT VEHICLE to a gym near the SUBJECT PREMISES.

43.   Verizon records show that the number ending in 0373 was registered to CONTRERAS in 2012 and listed an iPhone as the phone for the account.  Wells Fargo records show that an iPhone was utilized to login into CONTRERAS's Wells Fargo Account approximately 130 times.

44.   According to Superintendent ████████ and Director of Technology ████████████ ("DOT ████████"), CONTRERAS was assigned an HP Laptop with School District tag #012183, serial number 5CG0420TWK (the "HP Laptop") to conduct School District business.  According to DOT ████████, as of September 15, 2023, the HP Laptop had not been returned to the School District.

## V.   TRAINING AND EXPERIENCE ON EMBEZZLEMENT, MONEY LAUNDERING, AND CONSPIRACY.

45.   Based on my training and experience and information obtained from other law enforcement officers and agents who investigate fraud schemes, such as embezzlement, and money laundering crimes and conspiracies, I know that individuals involved in fraud schemes, such as embezzlement, and money laundering crimes and conspiracies will often:

a.   Transfer fraud or embezzlement proceeds through multiple bank accounts in order to disguise the nature, location, source, ownership, or control of those proceeds.

b.   Work with other coconspirators and individuals to help facilitate those schemes, by, for example, transferring embezzled money through another person's bank account, by working with others to create or operate shell businesses or other businesses as a "front" to help conceal money laundering or embezzlement, or by commingling funds from other sources to create the appearance of legitimate income.

c.   Use digital devices, such as cell phones and computers to facilitate and conduct embezzlement and money laundering, including for purposes of tracking and transferring money that is part of those schemes, creating false documentation or generating documentation regarding shell businesses or "front" businesses to hide those schemes, and to communicate with coconspirators and individuals involved in those schemes.

22

d.    Maintain, in digital devices, telephone numbers, email addresses, and other contact information and communications with and involving their coconspirators and others involved in the scheme in order to conduct their business.  Additionally, digital devices such as cellular phones and computers are often used to store photographs of, and documentation regarding, items purchased with illegally derived funds.

e.    Maintain records (including financial records, receipts and documentation of expenditures, notes, mail, and other correspondence, negotiated instruments, contracts, ledgers, tax records, and other papers) related to their crimes. And these records, along with digital devices, cash, and/or high-value items (i.e., items exceeding $10,000) purchased with illegally derived funds are often maintained in safe locations, such as their homes or vehicles.

46.  Additionally, based on my training and experience and information obtained from other law enforcement officers and agents who investigate fraud schemes, such as embezzlement, and money laundering crimes and conspiracies, I know that individuals engaged in such schemes commonly participate in these activities for profit.  It is common for the proceeds of fraud schemes to be in the form of cash, negotiable instruments, or other assets.  Furthermore, it is common for persons engaging in fraud schemes to invest the profits in other assets, convert the profits to other forms of financial instruments, and/or pay personal expenditures with the profits.  I am aware that such

transactions, transfers, or expenditures of criminally derived profits cause the creation of numerous types of documents, which reflect the fruits of the fraudulent scheme. I am also aware that documents such as bank records, cashiers' check records, receipts, invoices, expenditure records, escrow documents, notes or notations, and other similar documents are generated upon the transactions, transfers, and/or expenditures of criminally derived funds. I know from training and experience that these types of records are also commonly kept in homes or vehicles.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

47. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, among other things, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a digital device, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

24

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

48.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

   49.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress the thumb- and/or fingers of CONTRERAS
or ███ on the device(s); and (2) hold the device(s) in front of
face of CONTRERAS or ███ with that person's eyes open to
activate the facial-, iris-, and/or retina-recognition feature.

## VII. <u>CONCLUSION</u>

    50.  For all the reasons described above, there is probable
cause to believe CONTRERAS violated Title 18, United States
Code, Section 666(a)(1)(A) (embezzlement concerning programs
receiving federal funds), and a warrant should issue for his
arrest.  Additionally, there is probable cause to find that the
items listed in Attachment B, which constitute evidence, fruits,

and instrumentalities of violations of the Subject Offenses,
will be found in a search of the SUBJECT PREMISES, the SUBJECT
VEHICLE, on the person of CONTRERAS and ████ as well as in
digital devices found on their person, in the SUBJECT PREMISES
or in the SUBJECT VEHICLE.

/s/
Timothy W. Bamford,
Special Agent, FBI

Attested to by the applicant in
accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
12 day of October, 2023.


HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE